Dr. Mark McCOY, M.D.; and Cooper Clinic, P.A. *v.*
Paul MONTGOMERY, Carolyn Montgomery, and
St. Edward Mercy Medical Center

06-1243                                          259 S.W.3d 430

Supreme Court of Arkansas
Opinion delivered June 21, 2007

*Ledbetter, Cogbill, Arnold & Harrison, LLP*, by: *J. Michael Cogbill* and *Rebecca D. Hattabaugh*, for appellant Cooper Clinic, P.A.

*Bassett Law Firm*, by: *Dale Garrett*; *Womack, Landis, Phelps, NcNeill & McDaniel, P.A.*, by: *Paul D. McNeill* and *Mark Mayfield*, for appellant D. Mark McCoy, M.D.

*McDaniel & Wells, P.A.*, by: *Bobby McDaniel*; *John Burnett*; *Rex W. Chronister*; and *Eubanks, Baker & Schulze*, by: *J.G. "Gerry" Schulze*, for appellees.

Jim Gunter, Justice. This appeal arises from a jury verdict in Sebastian County Circuit Court finding Appellant, Dr. Mark McCoy, negligent in treating Appellee Paul Montgomery for peripheral vascular disease. We affirm the jury's findings.

## Statement of the Case

Montgomery was referred to McCoy by his family physician after complaining of calf pain. McCoy saw Montgomery on June 15, 1998, and diagnosed Montgomery as having peripheral vascular disease. On June 25, 1998, Dr. Timothy A. Waack, a cardiologist, performed a Persantine nuclear stress test on Montgomery to evaluate the severity of his known coronary artery disease. Waack then scheduled Montgomery for a heart catheterization on June 29, 1998, to be performed by Dr. Riley Foreman. After the catheterization, Foreman believed that there was blockage in the left main artery and blockage of the right coronary artery. On June 30, 1998, McCoy performed coronary artery bypass grafting surgery. On August 17, 1998, Waack ordered cardiac rehabilitation. On August 25, 1998, McCoy performed a femoral-popliteal bypass of the superficial femoral artery on each leg. On October 6, 1998, Montgomery complained of pain in the right leg. An ultrasound located a blood clot, and Dr. Drohlsagen administered clot-busting medication. On November 6, 1998, Montgomery again complained of right leg pain and McCoy performed a thrombectomy to remove the blood clot. On November 22, 1998, Dr. Jane McKinnon identified a blood clot in the left graft. Following an attempt to resolve with medication alone, McKinnon surgically revised the left graft.

Following this surgery, Montgomery traveled to the Texas Heart Institute to see Dr. George Reul. Reul found that the right graft was too long, and had "kinked," and on May 5, 1999, he revised the graft. Approximately a year later, an angiogram revealed a right anastomotic aneurysm. On September 8, 2000, Montgomery had a bypass from the aorta to the femoral artery.

Reul performed thrombectomies on May 12, 2001, and December 16, 2002. On March 10, 2003, Reul amputated Montgomery's right leg above the knee.

.       On June 29, 2003, Montgomery, and his wife, Carolyn Montgomery, filed suit, claiming medical malpractice in the heart and leg treatment against McCoy, Foreman, Waack, Cooper Clinic, P.A., and St. Edward Mercy Medical Center. On February 7, 2003, the court entered an order granting Montgomery's motion for voluntary nonsuit as to the defendants, Foreman, Waack, and Cooper Clinic. On August 21, 2003, the court entered an order granting Montgomery's motion for voluntary nonsuit as to the defendants, McCoy and St. Edward Mercy Medical Center.

On November 25, 2003, the Montgomerys refiled the action, relying on Ark. Code Ann. § 16-56-126 (1987). McCoy filed a motion to dismiss, arguing that the Montgomerys could not benefit from § 16-56-126. On April 15, 2004, the court denied McCoy's motion to dismiss and for summary judgment. On February 27, 2006, the Montgomerys amended their complaint to add a claim of punitive damages. McCoy's motions to strike and for a continuance were both denied.

A jury trial was held March 13, 2006, through March 24, 2006. At the conclusion of the evidence, the jury returned a verdict for the Montgomerys on the question of the leg surgery, awarding damages that totaled $2,800,000 in actual damages, $200,000 in loss of consortium damages to Mrs. Montgomery, and an additional $500,000 in punitive damages. The trial court entered judgment pursuant to Rule 54(b) of the Arkansas Rules of Civil Procedure, severing St. Edward Mercy Medical Center from this case. On April 19, 2006, McCoy filed a timely notice of appeal. A notice of cross-appeal was filed by the Montgomerys on May 1, 2006, but it has been abandoned on appeal. On November 11, 2006, McCoy petitioned this court for a writ of certiorari to complete the record. We granted his petition on November 16, 2006. McCoy now brings this appeal.

*Service*

For his first point on appeal, McCoy argues that no timely service was completed, and therefore, the first action against him did not commence. The Montgomerys respond, arguing that service was valid, and when the first action was voluntarily

dismissed without prejudice, they were entitled to refile within one year under the Arkansas Savings Statute, codified at Ark. Code Ann. § 16-56-126 (1987).

Rule 3 of the Arkansas Rules of Civil Procedure provides that an action is commenced by filing a complaint with the clerk of the proper court. *Bodiford v. Bess*, 330 Ark. 713, 956 S.W.2d 861 (1997) (citing *Sublett v. Hipps*, 330 Ark. 58, 952 S.W.2d 140 (1997)); *Forrest City Mach. Works, Inc. v. Lyons*, 315 Ark. 173, 866 S.W.2d 372 (1993); *Green v. Wiggins*, 304 Ark. 484, 803 S.W.2d 536 (1991)). However, effectiveness of the commencement date is dependent upon meeting the requirements of Ark. R. Civ. P. 4(i), which provides in pertinent part:

> (i) Time Limit for Service: If service of the summons is not made upon a defendant within 120 days after the filing of the complaint, the action shall be dismissed as to that defendant *without prejudice* upon motion or upon the court's initiative. If a motion to extend is made within 120 days of the filing of the suit, the time for service may be extended by the court upon a showing of good cause. . . .

(Emphasis added.) Rule 4(i) must be read in light of other procedural rules, such as the statute of limitations. *Id.* For example, the dismissal without prejudice language [in Rule 4(i)] does not apply if the plaintiff's action is otherwise barred by the running of a statute of limitations. The touchstone for a limitations defense to a tort action is when the cause of action was commenced. *Id.*

Pursuant to section 16-56-126, a plaintiff may commence a new action within one year after suffering a nonsuit. *Posey v. St. Bernard's Healthcare, Inc.*, 365 Ark. 154, 226 S.W.3d 757 (2006). However, we have recognized that failure to comply with the service requirements of Rule 4(i) results in a failure to commence the action so as to effectuate the one-year savings provision provided in section 16-56-126. *Id.*; *see also Green*, 304 Ark. 484, 803 S.W.2d 536. Even though this court has interpreted the savings statute liberally, applying it in cases where a timely, completed attempt at service was later held to be invalid, we have specifically held that service of process must, at least, be timely attempted in order for the action to be deemed to have commenced so that the savings statute will apply. *Posey*, 365 Ark. 154, 226 S.W.3d 757 (citing *Forrest City Mach. Works, Inc. v. Lyons*, 315 Ark. 173, 866 S.W.2d 372 (1993)). In *Posey*, the plaintiffs admitted that they did not attempt to comply with the service of process

requirements of Rule 4; therefore, we held that they could not avail themselves of the protections of the savings statute in an attempt to refile their cause of action.

In *Lyons*, the plaintiff effected the commencement date of filing his complaint for limitation purposes by completing service on the defendant. The trial court eventually dismissed Lyons's action because of improper service. Nonetheless, we held that dismissal did not bar Lyons from later refiling his suit. *Lyons*, 315 Ark. 173, 866 S.W.2d 372. We stated that our interpretation of section 16-56-126 met with the liberal and equitable construction which must be given it in order to give litigants a reasonable time to renew their cause of action when they are compelled to abandon it as a result of their own act or the courts. *Id.*

With this precedent in mind, we turn to the present case. Here, the Mongomerys attempted service on McCoy. The return receipt was signed by Julie Cossar, McCoy's secretary. The circuit court found that the Montgomerys complied with the requirements of Rule 4(e) and Rule 4(d)(8)(a) in that service of summons and complaint upon McCoy were sent by mail addressed to McCoy, return receipt requested and delivery restricted to McCoy or his agent. The circuit court's order stated:

> The Court notes that [McCoy] now asserts that Julie Cossar, who signed the certified mail document, was not his agent. However, [McCoy] does not acknowledge who his agent was. The Court further notes that it is common practice for physicians to appoint an agent to receive papers for him so they will not have to be interrupted while examining patients, engaging in surgery or other aspects of their medical practice. The Court further notes that [the Montgomerys] not only served [McCoy] by certified mail, return receipt requested, restricted delivery, they further sent interrogatories certified mail, return receipt requested, restricted delivery and the same person within [McCoy's] office signed for these documents as [McCoy's] agent also. Based upon the totality of the circumstances, specifically the two separate notifications to [McCoy] signed by the same "agent," the Court is of the opinion that [the Montgomerys have] complied with the requirements of Rule 4(d)(8)(a) and Rule 4(e) and therefore service upon [McCoy] is valid service.

Unlike the circumstances in *Posey*, where we held that the savings statute did not apply because the plaintiffs did not even attempt service, or in *Lyons*, where we found that the savings

statute did apply even though service was found to be improper, the Montgomerys attempted service, and the trial court held that service was proper. Therefore, we hold that the savings statute is applicable in this case, thus entitling the Montgomerys to refile.

### Punitive Damages

For his second point on appeal, McCoy argues that his diagnosis and treatment of Montgomery according to his professional judgment was not malicious conduct requiring punishment. He asserts that the award of punitive damages "required overreaching to guesswork and unfounded assumptions." The Montgomerys respond, arguing that there was substantial evidence from which a jury could have reasonably concluded that McCoy engaged in conduct warranting punitive damages. Specifically, the Montgomerys argue that McCoy falsified records to make unnecessary surgery seem necessary and performed a "botched" surgery ultimately resulting in the amputation of Montgomery's leg.

On appeal, we view the evidence in the light most favorable to the appellee and affirm if there is substantial evidence to support the jury's verdict. *Bank of Am., N.A. v. C.D. Smith Motor Co., Inc.*, 353 Ark. 228, 106 S.W.3d 425 (2003). When reviewing an award of punitive damages, we consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. *Calvary Christian Sch., Inc. v. Huffstuttler*, 367 Ark. 117, 238 S.W.3d 58 (2006) (citing *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999)). Punitive damages are to be a penalty for conduct that is malicious or done with the deliberate intent to injure another. *Id.*

In determining whether there is sufficient evidence to support an award of punitive damages in a negligence case, we have recognized that an award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred. In other words, in order to superadd this element of damages by way of punishment, it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred. In order to warrant a submission of the question of punitive damages, there

must be an element of willfulness or such reckless conduct on the part of the defendant as is equivalent thereto. *Yeakley v. Doss*, 370 Ark. 122, 257 S.W.3d 895 (2007).

In the present case, McCoy made notes dated June 15, 1998, that Montgomery could not walk a block or remain on a treadmill for three minutes, and that his limitations interfered with his ability to work. Montgomery denies having told McCoy that his symptoms were this severe. There was testimony at trial that on June 27, 1998, Montgomery danced for three hours at his class reunion and helped load musical equipment into a truck. There was also testimony that Montgomery's health problems did not interfere with his work. McCoy recorded the absence of pedal pulses during his treatment of Montgomery, which would support McCoy's recommendation of surgery. However, at trial, several nurses testified that they did record pedal pulses when examining Montgomery.

Further, McCoy wrote a letter to Dr. Tompkins, indicating that he "agreed" with Tompkins that the severity of Montgomery's condition warranted angiography and revascularization. McCoy admitted during his testimony that he had not spoken to Tompkins. There was testimony given at trial that suggested that McCoy avoided conducting routine tests before surgery that would have shown that surgery was unnecessary. There was also testimony from McKinnon, McCoy's former partner, that McCoy always knew whether patients had insurance, and this would factor into his decision whether to operate. McKinnon further testified that McCoy "tried to do as many cases as possible, rushing through one to do another that day, and I thought that probably compromised the techniques." McKinnon stated that she had approached McCoy about his fem-pop surgery technique, specifically that she thought his grafts were too long and not done appropriately. McKinnon, Ruel, and Dr. Bruce Murphy all testified that the kink in Montgomery's right graft was detectable on October 6, 1998, and had McCoy corrected the kink at that time, amputation of Montgomery's leg would not have been necessary. McCoy testified that on November 6, 1998, he and Montgomery discussed whether to perform surgery to repair the graft, and the decision was made not to perform the surgery. However, McCoy testified that while it is his habit to record that type of discussion, he could not find a record of his discussion with Montgomery.

As to conflicting evidence presented in this case, it was up to the jury to resolve the conflicts in the testimony and judge

the weight and credibility of the evidence. *See Bank of Am., supra* (citing *Cadillac Cowboy, Inc. v. Jackson*, 347 Ark. 963, 69 S.W.3d 383 (2002)). In viewing the evidence in the light most favorable to the Montgomerys, we hold there was sufficient evidence for the jury to have determined that McCoy engaged in malicious conduct in his treatment of Montgomery, warranting an award of punitive damages.

*Arkansas Rule of Evidence 612*

For his third point on appeal, McCoy argues that the trial court erred by allowing Dr. Wendell Ross to testify by reading directly from his affidavit during his direct examination. Specifically, McCoy contends that the trial court's decision to allow Ross to read from his affidavit violated Ark. R. Evid. 612 (2005). The Montgomerys respond, arguing that McCoy did not preserve this issue for appeal, and, in the alternative, the circuit court did not abuse its discretion in permitting Ross to read directly from his affidavit.

We have repeatedly held that an appellant may not change the grounds for objection on appeal, but is limited by the scope and nature of the objections and arguments presented at trial. *See. e.g., S. College of Naturopathy v. State ex rel. Beebe*, 360 Ark. 543, 203 S.W.3d 111 (2005); *Dovers v. Stephenson Oil Co., Inc.*, 354 Ark. 695, 128 S.W.3d 805 (2003); *Barnes v. Everett*, 351 Ark. 479, 95 S.W.3d 740 (2003).

In the present case, McCoy did not preserve his argument that Ark. R. Evid. 612 precluded Ross from reading his affidavit during his direct examination. At trial, McCoy stated, "I believe it is inappropriate to have him read the affidavit." The trial court decided to permit the testimony. Ross continued to testify from the affidavit, stating, among other things, that he did not believe that Montgomery's surgery was necessary. McCoy objected again, saying, "I did not object a while ago but I will from this point on. I believe Mr. McDaniel indicated that the affidavit was prepared to correct previously given deposition testimony. . . I am objected [sic] because I believe it violates the Rules of Civil Procedure if an attorney cannot object." McCoy never objected on the grounds that reading from the affidavit would violate Ark. R. Evid. 612. McCoy is limited by the scope and nature of his objections and arguments at trial. *See S. College of Naturopathy, supra*. Accordingly, we will not address McCoy's argument for the first time on appeal.

*Exclusion of Lonnie Harrison, M.D.*

■ For his fourth point on appeal, McCoy argues that the trial court erred in excluding any mention of Dr. Lonnie Harrison. Specifically, McCoy argues that Harrison participated in consulting with two of the Montgomerys' experts, Drs. Patrick and Murphy. The Montgomerys argue that there was no relevance to Harrison's involvement in this case, and even if his involvement was relevant, the mention of Harrison would have been unfairly prejudicial to the Montgomerys.

As the trial court determined that Harrison's testimony was not relevant, it was not necessary to engage in an analysis under Ark. R. Evid. 403 (2005). Accordingly, our review on appeal is limited to the issue of whether the trial court abused its discretion in granting the Montgomerys' motion in limine on the basis that the evidence was not relevant. *See Yeakley v. Doss, supra.*

Pursuant to Ark. R. Evid. 401 (2005), "relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Arkansas Rule of Evidence 402 (2005) provides that irrelevant evidence is inadmissible. In discussing our standard of review for evidentiary rulings, we have said that trial courts have broad discretion and that a trial court's ruling on the admissibility of evidence will not be reversed absent an abuse of that discretion. *Id.* (citing *Owens v. State*, 363 Ark. 413, 214 S.W.3d 849 (2005)).

■ Here, the Montgomerys employed Harrison as a consultant and legal assistant on their case. The fact that Harrison participated in consulting with two of the Montgomerys' experts has no relevance in this case. Similarly, the fact that Harrison had been convicted of drug possession, causing him to lose his medical license, is also irrelevant. Keeping in mind our standard of review regarding evidentiary rulings, we hold that the trial court did not abuse its discretion in excluding any mention of Harrison at trial.

*Ark. R. Civ. P. 49*

For his fifth point on appeal, McCoy argues that the trial court submitted an incomplete description of damages in a single interrogatory, violating Ark. R. Civ. P. 49 (2005). McCoy further asserts Ark. R. Civ. P. 49 was violated when the jurors signed a

single interrogatory rather than separate interrogatories. The Montgomerys respond, arguing that McCoy never objected at trial to the verdict forms other than to request a general verdict. They contend that even if McCoy's argument is preserved, the trial court did not abuse its discretion.

■ It is well settled that this court will not consider arguments raised for the first time on appeal. *See Ford Motor Co. v. Ark. Motor Vehicle Comm'n*, 357 Ark. 125, 161 S.W.3d 788 (2004). In the present case, other than to request a general verdict, McCoy never raised an objection with regard to the verdict forms. McCoy never objected at trial that each line item required a separate verdict. He also failed to object on the grounds that the jurors did not sign separate interrogatories. Therefore, we conclude that he did not preserve these arguments, and we will not address them for the first time on appeal.

### Exclusion of Dr. Diethrich's Deposition

McCoy argues that the trial court should have permitted the deposition of Dr. Edward Diethrich, founder of the Arizona Heart Institute, to be read, or alternatively, continued the case. McCoy asserts that he was deprived of one of his two primary experts on the eve of trial, which was prejudicial to his case. The Montgomerys, in reply, state that the trial court properly excluded Diethrich's deposition because of his misconduct and refusal to respond to questions.

On February 28, 2006, a video deposition was taken of Diethrich in Phoenix, Arizona. During cross-examination by counsel for the Montgomerys, Diethrich refused to answer questions regarding his litigation history, including questions concerning multiple malpractice lawsuits that had been filed against him. Diethrich also refused to answer questions concerning conflicts with the Arizona State Medical Board and an investigation by the FDA about a claim that he was using improper and unsafe medical devices. After being asked about a complaint that had been filed against him, Diethrich objected and asked for a recess. The circuit court's order states, "[i]t was not disputed by Dale Garrett, counsel for McCoy, that he warned Diethrich that his continual refusal to answer questions concerning his litigation history, may, in fact, cause the Court to exclude his entire evidence deposition." The circuit court found that many of the questions counsel for the

Montgomerys wanted to ask Diethrich were proper impeachment questions. At the March 7, 2006, pretrial hearing, the court stated:

> I am not going to continue this case. After listening to the tape and the arguments, the two alternatives that I considered were striking the testimony in its entirety by way of deposition but permitting the doctor to testify in court if he wants to, whereby he can still be that expert witness for Dr. McCoy but must come to court, or playing the tape in its entirety and letting Mr. McDaniel, by way of proffer I guess, tell the jury what he wanted to ask and what he thought the answers would be. I just do not think that idea is a proper remedy. The motion to strike is granted.

We agree with the circuit court that playing the tape in its entirety and letting counsel for the Montgomerys tell the jury what he wanted to ask and what he thought the answers would be would not have been the proper remedy. The Montgomerys were not able to properly cross-examine Diethrich because he refused to answer questions, and playing the tape in its entirety would not remedy this problem.

Further, even though the circuit court excluded the deposition, it permitted Diethrich to come and testify in court in Arkansas. McCoy argues that Diethrich, who lives in Arizona, was already scheduled to be in Colorado at the time of trial for a seminar. The Montgomerys contend McCoy produced no evidence to support his assertion that Diethrich could not testify in Arkansas. Based upon our standard of review, we hold that the circuit court did not abuse its discretion by striking Diethrich's deposition testimony, and allowing him to testify live at trial, thereby giving McCoy a second chance to introduce his expert's testimony.

Because we affirm the judgment entered against McCoy, we need not reach his argument that judgment against Cooper Clinic, P.A., should be reversed. For the reasons stated above, we find no basis for reversing the judgment against McCoy. Accordingly, we affirm the jury's verdict.

Affirmed.

DANIELSON, J., not participating.